The CINCINNATI INSURANCE COMPANY, Plaintiff,

v.

QUORUM MANAGEMENT CORP., a/k/a Quorum Management Company; Juan Martin Nero; Guillermo Caset; Nicholas Espain; Anthony J. Campbell; Diamond State Insurance Company a/s/o Quorum Management Corp., Franck's Pharmacy, Inc., and Franck's Lab, Inc., Defendants.

Case No. 5:12-cv-406-Oc-10PRL

United States District Court, M.D. Florida, Ocala Division.

Signed 05/13/2016

**1310**

Chris Ballentine, Fisher, Rushmer, Werrenrath, Dickson, Talley & Dunlap, PA, Orlando, FL, David Arthur Glenny, Bice Cole Law Firm, PL, Ocala, FL, for Plaintiff.

Alvaro L. Mejer, Mejer Law, PA, Craig B. Shapiro, Fernando S. Aran, Aran, Correa, Guarch & Shapiro, PA, Coral Gables, FL, Ashley B. Jordan, Christine A. Gudaitis, Richard Hugh Lumpkin, Ver Ploeg & Lumpkin, PA, Joshua Ross Goodman, Cozen O'Connor, Miami, FL, William E. Gericke, Cozen O'Connor, Philadelphia, PA, for Defendants.

## ORDER GRANTING SUMMARY JUDGMENT ON DUTY TO DEFEND

WM. TERRELL HODGES, UNITED STATES DISTRICT JUDGE

This is a diversity jurisdiction declaratory judgment insurance coverage action.[1] Before the Court are cross-motions for summary judgment concerning Plaintiff, The Cincinnati Insurance Company's ("Cincinnati's"), duty to defend an action brought against its insureds in state court. This is also a tragic case involving the deaths of twenty-one (21) internationally competitive polo horses owned by Defendants Quorum Management Corp. ("Quorum"), Juan Martin Nero, Guillermo Caset, and Nicolas Espain.[2] The horses were injected with a nutritional supplement that was ordered by a licensed veterinarian, and compounded and manufactured by Defendant Franck's Lab, Inc. ("Franck's") and one of its employees, Defendant Anthony J. Campbell. Unfortunately, Franck's and Campbell improperly formulated the compound, which resulted in mixing in a lethal dose of sodium selinite. Shortly after the polo horses were injected with the improperly compounded nutritional supplement, they went into cardiac arrest and died.

On March 29, 2010, Quorum, Nero, Caset, Espain, and Diamond filed a state court action against Franck's, Campbell, and others, seeking to recover damages for the loss of the polo horses.[3] Cincinnati had

---

1. The Parties agree that Florida law governs the substantive issues in this case.

2. Defendant Diamond State Insurance Company ("Diamond") issued a policy to Defendant Quorum insuring the polo horses, and has made payments to Quorum under the policy in the amount of $1,320,000 for the loss of the horses.

3. See Quorum Management Corp., etc., et al. v. Franck's Pharmacy, Inc., et al., Case No. 50 2010 CA 009112 XXXX MB, Fifteenth Judicial Circuit, In and For Palm Beach County, Florida (the "Underlying Case").

insured Franck's (and Campbell as an employee of Franck's) under a Commercial General Liability Policy and a Commercial Umbrella Policy.[4] When Franck's and Campbell asked Cincinnati to undertake their defense in the Underlying Case, Cincinnati refused to do so and denied coverage.

The Underlying Case proceeded to trial, and on March 11, 2016, a jury verdict was rendered in favor of Quorum, Nero, Caset, Espain, and Diamond and against Franck's and Campbell, in the total amount of $2,516,985.78 (Doc. 87-1).

While litigation in the Underlying Case continued, Cincinnati filed the present action in this Court, seeking a declaratory judgment that it had no duty to defend, and no duty to indemnify, Franck's or Campbell in the Underlying Case (Doc. 1). Cincinnati filed an Amended Complaint (Doc. 15),[5] and Franck's filed an Amended Counterclaim for breach of contract (Doc. 18). These are the operative pleadings in this case.

On September 17, 2013, the Court granted Franck's and Campbell's motion to stay all proceedings related to the question of whether Cincinnati has a duty to indemnify Franck's and Campbell (Doc. 48). The issue of whether Cincinnati has a duty to defend Franck's and Campbell, and the breach of contract counterclaim, were allowed to proceed.

Presently pending are four motions and cross-motions for summary judgment (Docs. 34, 39, 55, 59) on the issue of Cincinnati's duty to defend Franck's and Campbell in the Underlying Case. Each of the motions has been fully briefed, and is ripe for disposition.

Upon a review of the record and the applicable legal precedent, the Court finds that Cincinnati has successfully demonstrated as a matter of law that it has no duty to defend either Franck's or Campbell in the Underlying Case. The damages claimed against Franck's and Campbell in the state court action are excluded from coverage under both of Cincinnati's policies because they fall within the "products and professional services" exclusion and the "products completed operations hazard" exclusion. Summary judgment will therefore be granted to Cincinnati and denied to the Defendants. Because the duty to defend is broader than the duty to indemnify, see Fun Spree Vacations, Inc. v. Orion Ins. Co., 659 So.2d 419, 421–22 (Fla. 3rd Dist.Ct.App.1995), the Court further finds that there are no remaining claims left to resolve in this case. Final judgment will therefore also be entered accordingly.

### Undisputed Material Facts [6]

### I. The Underlying State Lawsuit

On March 29, 2010, Quorum, Nero, Caset, Espain, and Diamond filed a state court action against Franck's, Campbell, and others, seeking to recover damages for the loss of the polo horses in the amount of

---

4. Franck's also was insured under a professional services liability policy.

5. Cincinnati's original complaint also listed its other insured, Franck's Pharmacy, Inc., (not to be confused with Franck's Lab, Inc.) as a defendant. Cincinnati subsequently determined that it did owe a duty to defend Franck's Pharmacy, Inc., and on October 5, 2012, Cincinnati filed its amended complaint dismissing Franck's Pharmacy, Inc. as a defendant in this case.

6. Because the pending motions are limited solely to a discussion of Cincinnati's purported duty to defend, the Court has limited its review of the record to the third amended complaint in the Underlying Case, and the relevant policy provisions and insurance documents. See Jones v. Florida Ins. Guar. Ass'n, Inc., 908 So.2d 435, 443 (Fla.2005); National Union Fire Ins. Co. v. Lenox Liquors, Inc., 358 So.2d 533, 536 (Fla.1977).

$4,076,000. See Quorum Management Corp., etc., et al. v. Franck's Pharmacy, Inc., et al., Case No. 50 2010 CA 009112 XXXX MB, Fifteenth Judicial Circuit, In and For Palm Beach County, Florida (the "Underlying Case"). The complaint has been amended twice, and the third amended complaint, dated September 20, 2011, is the operative pleading in the Underlying Case (Doc. 34, Ex. 3).

The third amended complaint alleges that Quorum is a Florida corporation, and was the owner of 12 internationally competitive polo horses. (Doc. 34, Ex. E, ¶ 1). Nero, Caset, and Espain are each citizens of Argentina, internationally known polo players, and were the owners of the other 9 polo horses. (Id., ¶¶ 2-4). Diamond is an insurance company licensed to do business in Florida, and issued a policy to Quorum for its 12 polo horses. (Id., ¶¶ 5, 11-12).

The complaint in the Underlying Case further alleges that Franck's is a Florida corporation located in Ocala, and at all relevant times, was engaged in the business of "designing, formulating, compounding, manufacturing, selling, and distributing veterinary medications and nutritional supplements." (Doc. 34, Ex. 3, ¶ 7). Campbell was employed by Franck's "to participate in, oversee, manage and supervise the formulation, compounding, manufacturing, and distribution of veterinary medications and nutritional supplements." (Id., ¶ 8).

According to the complaint, on or about April 15, 2009, James S. Belden, a licensed veterinarian practicing in Florida, ordered a mineral and vitamin nutritional supplement compound from Franck's to be administered to the polo horses. (Doc. 34, Ex. 3, ¶¶ 18, 21). The formula Belden transmitted to Franck's was as follows: Centesimal composition: Selenium (as sodium selenite) 45 mg, Potassium aspartate hemihydrates 1.0g, Magnesium aspartate tetrahydrate 1.5g, Methylparahydroxybenzoate 0.140g, Propyle para-hydroxybenzoate 0.010g, Exc. q.s.q. 100 ml. (Id., ¶ 20).

An error was made by Franck's and Campbell while compounding the formula, and instead of mixing the formula as transmitted, Franck's and Campbell added 10 grams (rather than the prescribed 45 mg) of sodium selenite—a lethal dose. (Doc. 34, Ex. 3, ¶ 23). Franck's and Campbell compounded and manufactured the improper supplement, and sold and distributed it to Belden and the owners of the polo horses. (Id., ¶ 26). The supplement was administered to the polo horses on April 19, 2009; shortly after, the horses went into cardiac arrest and died. (Id., ¶¶ 26-27).

The Underlying Case asserts state law claims of negligence and strict liability against Franck's and Campbell (Doc. 34, Ex. 3, Counts I-II, V-VI). Each of the claims assert that Franck's and Campbell's negligence and/or strict liability is based, among other things, on their compounding, re-formulating, manufacturing, selling, and/or distributing a dangerously defective nutritional supplement, failing to properly and adequately inspect and/or test the nutritional supplement and/or failure to warn that the supplement was defective, and failing to adequately hire, train and supervise their agents and employees. (Id.). The third amended complaint nowhere refers to Franck's or Campbell as a pharmacist, or alleges that either engaged in the provision of professional health care services.

## II. The Relevant Policy Provisions

Cincinnati issued to Franck's a Commercial General Liability policy, number CPP 081 02 75, which covered the period January 1, 2007 through January 1, 2010, and for which Franck's paid an annual premium of $7,743 (the "CGL Policy") (Doc. 1-4, p. 24, Doc. 61-4, p. 81). The CGL Policy provided a general aggregate coverage limit of $2,000,000, and a limit of $1,000,000

per occurrence. It was an "occurrence" policy, meaning that the insurance covered "bodily injury" or "property damage" that "occurs during the policy period" and is caused by an "occurrence" that takes place within the "coverage territory." Cincinnati also issued to Franck's an occurrence-based Umbrella Policy (also with policy number CPP 081 02 75) covering the same time period, and with the same occurrence and aggregate dollar limits (Doc. 1-4, p. 64). The Umbrella Policy would be triggered when the limits of the CGL Policy were exhausted by payment of claims.

Both Policies define an "insured" to include individuals, partnerships, joint ventures, limited liability companies, corporations, trusts. (Doc. 1-4, pp. 35, 75). "Insured" also includes volunteer workers, employees, and managers, for acts performed within the scope of their duties and/or employment related to the conduct of the insured's business. (Id.)

An "occurrence" is defined as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." (Doc. 1-4, pp. 43, 83). Both Policies also define "property damage" as: "(a) Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or (b) Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the 'occurrence' that caused it." (Id., pp. 44, 84).[7]

The CGL Policy and the Umbrella Policy contain two exclusions that are relevant to the facts of this case, both of which are stated in an endorsement entitled "Exclusion—Products and Professional Services (Druggists)." (Doc. 34, Ex. 1). The first exclusion in this endorsement states that the insurance does not apply to: " 'Bodily injury', 'property damage' or 'personal and advertising injury' arising out of the rendering or failure to render professional health care services as a pharmacist." (Id.). The second exclusion provides that there is no insurance coverage for: " 'Bodily injury' or 'property damage' included within the 'products-completed operations hazard'." (Id.). The Umbrella Policy contains a similar endorsement with both exclusions.[8] Neither Policy defines "pharmacist" or "professional health care services."

The Policies define "products-completed operations hazard" as follows:

a. Includes all "bodily injury" and "property damage" occurring away from premises you own or rent and arising out of "your product" or "your work" except:

(1) Products that are still in your physical possession; or

(2) Work that has not yet been completed or abandoned. However, "your work" will be deemed completed at the earliest of the following times:

(a) When all of the work called for in your contract has been completed; or

(b) When all of the work to be done at the job site has been completed if your contract calls for work at more than one job site; or

(c) When that part of the work to be done at a job site has been put

---

7. The Umbrella Policy includes the phrase "or destruction of tangible property" in its definition of "property damage." (Doc. 1-4, p. 84).

8. The Umbrella Policy states that the insurance does not apply to: "(a) any liability arising out of the rendering or failure to render professional health care services as a pharmacist. (b) 'Bodily injury' or 'property damage' included within the 'products completed operations hazard'." (Doc. 34, Ex. 2).

to its intended use by any person or organization other than another contractor or subcontractor working on the same project.

Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed. (Doc. 1-4, pp. 43-44, 83-84).

"Your product:" is defined as: (1) Any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by: (a) You; (b) Others trading under your name; or (c) A person or organization whose business or assets you have acquired; and (2) Containers (other than vehicles), materials, parts or equipment furnished in connection with such goods or products. "Your product" also includes (1) Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your product;" and (2) The providing of or failure to provide warnings or instructions. ... (Doc. 1-4, pp. 44, 84-85).

Lastly, the Policies both define "Your work" to mean: (1) Work or operations performed by you or on your behalf; and (2) Materials, parts or equipment furnished in connection with such work or operations. It also includes: (1) Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your work;" and (2) The providing of or failure to provide warnings or instructions. (Doc. 1-4, pp. 45, 85).

### Summary Judgment Standard of Review

Pursuant to Federal Rule of Civil Procedure 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." In applying this standard, the Court must examine the materials on file and the record evidence "in the light most favorable to the nonmoving party." Samples on Behalf of Samples v. Atlanta, 846 F.2d 1328, 1330 (11th Cir. 1988). When faced with a "properly supported motion for summary judgment [the nonmoving party] must come forward with specific factual evidence, presenting more than mere allegations." Gargiulo v. G.M. Sales, Inc., 131 F.3d 995, 999 (11th Cir. 1997). The party opposing a motion for summary judgment must rely on more than conclusory statements or allegations unsupported by facts. Evers v. Gen. Motors Corp., 770 F.2d 984, 986 (11th Cir. 1985) ("conclusory allegations without specific supporting facts have no probative value").

At the summary judgment stage the judge's function is not to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). Some degree of factual dispute is expected, but to successfully counter a motion for summary judgment the factual dispute must "affect the outcome of the suit" and must be "such that a reasonable jury could return a verdict for the nonmoving party." Id. at 248, 106 S.Ct. at 2510.

However, in this case, neither side has requested a trial by jury on the duty to defend declaratory judgment claim (the only claim presently before the Court on summary judgment). Thus, the declaratory judgment claim will be resolved by the Court as the ultimate trier of fact. In such circumstances, it is the law of the Circuit that:

If decision is to be reached by the court, and there are no issues of witness credibility, the court may conclude on the basis of the affidavits, depositions, and stipulations before it, that there are no

genuine issues of material fact, even though decision may depend on inferences to be drawn from what has been incontrovertibly proved. Under those circumstances, which may be rare, the judge who is also the trier of fact may be warranted in concluding that there was or was not negligence, or that someone acted reasonably or unreasonably, ... even if that conclusion is deemed "factual" or involves a "mixed question of fact and law." A trial on the merits would reveal no additional data. Hearing and viewing the witnesses subject to cross-examination would not aid the determination if there are neither issues of credibility nor controversies with respect to the substance of the proposed testimony. The judge, as trier of fact, is in a position to and ought to draw his inferences without resort to the expense of trial.

Nunez v. Superior Oil Co., 572 F.2d 1119, 1123–24 (5th Cir.1978).[9] See also Feaz v. Wells Fargo Bank, N.A., 745 F.3d 1098, 1104 (11th Cir.2014) (The interpretation of an insurance contract is a question of law to be decided by the Court.).

### Discussion

## I. The Duty to Defend

 The general rule in Florida is that an insurance company's duty to defend an insured is determined solely from the allegations of the complaint when compared to the insurance policy's terms and conditions. See Jones v. Florida Ins. Guar. Ass'n, Inc., 908 So.2d 435, 443 (Fla.2005); National Union Fire Ins. Co. v. Lenox Liquors, Inc., 358 So.2d 533, 536 (Fla. 1977). When the complaint alleges facts that fairly and potentially bring the suit within the coverage afforded by the policy, the insurer must defend the action. Jones, 908 So.2d at 442–43. "The duty to defend is

of greater breadth than the insurer's duty to indemnify, and the insurer must defend even if the allegations in the complaint are factually incorrect or meritless." J.B.D. Constr., Inc. v. Mid–Continent Cas. Co., 571 Fed.Appx. 918, 926 (11th Cir.2014) (quoting Jones, 908 So.2d at 443). Moreover, even "[i]f the complaint alleges facts that are partially within and partially outside the scope of coverage, the insurer is obligated to defend the entire suit." Trizec Properties, Inc. v. Biltmore Constr. Co., Inc., 767 F.2d 810, 811–12 (11th Cir.1985) (citations omitted). Indeed, an insurer may be required to defend a suit even if it is later determined that there is no coverage. Trizec, 767 F.2d at 812. "However, if the pleadings show the applicability of a policy exclusion, the insurer has no duty to defend." State Farm Fire and Cas. Co. v. Tippett, 864 So.2d 31, 35 (Fla. 4th Dist.Ct. App.2003). Thus, while any doubts regarding the duty to defend must be resolved in favor of the insured, "[a]n insurer has no duty to defend a lawsuit where the underlying complaint does not allege facts that would bring the complaint within the coverage of the policy." Auto–Owners Ins. Co. v. Marvin Dev. Corp., 805 So.2d 888, 891 (Fla. 2d Dist.Ct.App.2001).

Following this body of law, Cincinnati argues that the allegations of the third amended complaint in the Underlying Case, even under the broadest and most liberal of readings, clearly and unequivocally show that both the professional health care services exclusion and the products completed operations hazard exclusion apply and, therefore, Cincinnati has no duty to defend Franck's or Campbell. Conversely, the Defendants argue that these exclusions are vague and ambiguous, and therefore should be interpreted

9. Fifth Circuit decisions rendered prior to September 30, 1981 are binding precedent on this Court. Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir.1982).

in favor of coverage. The Court will address each exclusion separately.[10]

## II. The Professional Health Care Services Exclusion

The professional health care services exclusion precludes insurance coverage for all " 'Bodily injury', 'property damage' or 'personal and advertising injury' arising out of the rendering or failure to render professional health care services as a pharmacist." The Umbrella Policy similarly excludes "Any liability arising out of the rendering or failure to render professional health care services as a pharmacist." Cincinnati contends that this exclusion is clear and unambiguous, and covers the alleged actions of Franck's and Campbell. The Defendants, however, argue both that the terms "professional health care services" and "pharmacist" are ambiguous, and that the allegations of the Underlying Case do not support that Franck's or Campbell rendered "professional health care services" as a "pharmacist."

■■■ When construing insurance policies, "courts should read the policy as a whole, endeavoring to give every provision its full meaning and operative effect." Auto–Owners Ins. Co. v. Anderson, 756 So.2d 29, 34 (Fla.2000). "If a policy provision is clear and unambiguous, it should be enforced according to its terms whether it is a basic policy provision or an exclusionary provision." Taurus Holdings, Inc. v. United States Fidelity & Guar. Co., 913 So.2d 528, 532 (Fla.2005). Where "language in a policy is plain and unambiguous, there is no special construction or interpretation required, and the plain language in the contract is to be given the meaning which it clearly expresses." Westport Ins. Corp. v. VN Hotel Group, LLC, 761 F.Supp.2d 1337, 1342 (M.D.Fla.2010)

(citing Jefferson Ins. Co. of N.Y. v. Sea World of Fla., Inc., 586 So.2d 95, 97 (Fla. 5th Dist.Ct.App.1991)).

■■■ On the other hand, "[i]f the relevant policy language is susceptible to more than one reasonable interpretation, one providing coverage and the [other] limiting coverage, the insurance policy is considered ambiguous." Auto–Owners, 756 So.2d at 34. "Ambiguous policy provisions are interpreted liberally in favor of the insured and strictly against the drafter who prepared the policy." Id. "Likewise, ambiguous insurance policy exclusions are construed against the drafter and in favor of the insured." Id. "When an insurer relies on an exclusion to deny coverage, it has the burden of demonstrating that the allegations of the complaint are cast solely and entirely within the policy exclusion and are subject to no other reasonable interpretation." Acosta, Inc. v. National Union Fire Ins. Co., 39 So.3d 565, 574 (Fla. 1st Dist.Ct.App.2010) (quotation omitted). However, the fact that the policy does not provide definitions of certain terms does not automatically render the terms ambiguous. Westport Ins. Corp., 761 F.Supp.2d at 1342. See also State Farm Fire and Cas. Co. v. Oliveras, 441 So.2d 175, 178 (Fla. 4th Dist.Ct.App.1983) ("[T]he fact that analysis is required for one fully to comprehend them does not mean the contracts are ambiguous.").

### A. The Term "Pharmacist"

■■■ The first area of dispute between the Parties is the meaning of the term "pharmacist." This term is not defined, and the complaint in the Underlying Case nowhere alleges that Franck's or Campbell were "pharmacists." However, this does not automatically render the term ambiguous. See General Star Indem. Co. v. West

---

**10.** The Parties do not dispute that absent these exclusions, Cincinnati would have a duty to defend Franck's and Campbell in the Underlying Case, and that the damages occurred within the applicable policy periods.

Florida Village Inn, Inc., 874 So.2d 26, 30 (Fla. 2d Dist.Ct.App.2004) ("The lack of a definition of an operative term does not, by itself, create ambiguity.") (citing State Farm Fire & Cas. Co. v. CTC Dev. Corp., 720 So.2d 1072, 1076 (Fla.1998)). The question, rather, is whether the term "pharmacist" has a "natural or plain meaning" under Florida law, and, if so, whether that meaning encompasses "compounding." The Court finds that the answer to both questions is "yes."

It is undisputed that Florida law provides the rule of decision for this case. And in this particular situation, Florida has a statutory scheme which defines "pharmacist" and is therefore directly applicable and persuasive. The Florida Pharmacy Act, Fla. Stat. §§ 465.001, et seq., defines "pharmacist" to mean "any person licensed pursuant to this chapter to practice the profession of pharmacy," and defines "pharmacy" to include "every location where medicinal drugs are compounded, dispensed, stored, or sold. ..." Fla. Stat. § 465.003(10), (11). In addition, the "practice of the profession of pharmacy" is defined to include compounding. Fla. Stat. § 465.003(13). The Act also prohibits anyone who is not a licensed pharmacist, or who is not operating under the direct and immediate personal supervision of a licensed pharmacist, from compounding any prescription, Fla. Stat. § 465.015(1)(b), and provides for disciplinary actions against a pharmacist who improperly compounds a prescription. Fla. Stat. § 465.016(1)(g).

In addition, the Florida Administrative Code recognizes that

"Compounding" is the professional act by a pharmacist or other practitioner authorized by law, employing the science or art of any branch of the profession of pharmacy, incorporating ingredients to create a finished product for dispensing to a patient or for administration by a practitioner or the practitioner's agent; and shall specifically include the professional act of preparing a unique finished product containing any ingredient or device ....

Fla. Admin. Code R. 64(B)16-27.700

The Court finds that the Florida statutes and regulations which govern the pharmacy profession clearly define the term "pharmacist" to include "compounding." As such, the term is clear and unambiguous.

Even without these legal authorities, the Court would reach the same conclusion. The Florida Supreme Court has stated that "[w]hen interpreting insurance contracts, we may consult references commonly relied upon to supply the accepted meanings of words." Garcia v. Federal Ins. Co., 969 So.2d 288, 291–92 (Fla.2007) (citations omitted). This includes using dictionaries. Id. (using Merriam Webster's Collegiate Dictionary 997 (10th ed. 1993) to define the phrase "with respect to"). See also Gov't Employees Ins. Co. v. Novak, 453 So.2d 1116, 1118 (Fla.1984) (citing Webster's Third New International Dictionary 11 (1966) to define "accident.").

Merriam Webster's Third New International Dictionary, Unabridged (1986) defines "pharmacist" as "one skilled in pharmacy; one engaged in the practice of pharmacy." The dictionary then defines "pharmacy" as "(1) the administering of drugs; treatment by drugs; (2) the art or practice of preparing, preserving, compounding, and dispensing drugs, of discovering new drugs through research, and of synthesizing organic compounds of therapeutic value; (3) a place where medicines are compounded or dispensed." (emphasis added). These definitions—i.e., the plain meaning of the terms "pharmacist" and "pharmacy"—clearly show that compounding is a part of being a pharmacist.[11]

11. See also http://www.merriam-webster.com/dictionary/pharmacist (defining "pharmacist" as "a person licensed to engage in pharma-

Lastly, several court decisions further support the determination that "compounding" is included in the plain meaning definition of "pharmacy" and "pharmacist." The United States Supreme Court has stated that "drug compounding is a process by which a pharmacist or doctor combines, mixes, or alters ingredients to create a medication tailored to the needs of an individual patient. ... It is a traditional component of the practice of pharmacy, and is taught as part of the standard curriculum at most pharmacy schools." Thompson v. Western States Medical Center, 535 U.S. 357, 360–61, 122 S.Ct. 1497, 152 L.Ed.2d 563 (2002). The Fifth Circuit Court of Appeals has similarly held that "[d]rug compounding is the process by which a pharmacist combines or alters drug ingredients according to a doctor's prescription to create a medication to meet the unique needs of an individual or animal patient." Medical Center Pharmacy v. Mukasey, 536 F.3d 383, 387 (5th Cir.2008). See also United States v. Franck's Lab, Inc., 816 F.Supp.2d 1209 (M.D.Fla.2011).[12]

The Defendants raise several arguments in an attempt to evade this exclusion, none of which have any merit. First, Defendants Quorum Management, Nero, Caset, Espain, and Diamond State argue that

Franck's is not a "pharmacist" because only individual <u>persons</u> over the age of 18, with a degree from a school or college of pharmacy can be a pharmacist. (Doc. 38, p. 18). To support this assertion, these Defendants cite to Fla. Admin. Code R. 64B16–26.203, which provides the requirements for applying for a pharmacist license in Florida. This regulation, however, does not define "pharmacist," but merely states the <u>individual</u> qualifications necessary to obtain a license. It has nothing to do with the operation of a pharmacy by a legal entity other than a natural person. Moreover, the acts which Franck's and Campbell are accused of in the Underlying Case clearly and unequivocally fall within the definition of the profession of pharmacy.

These Defendants next argue that Fla. Admin. Code R. 64B16–27.700, which defines the pharmacy practice of compounding, as well as what acts do not constitute compounding, excludes the alleged actions of Franck's and Campbell. This section of the Florida Administrative Code reads, in relevant part, as follows:

> "Compounding" is the professional act by a pharmacist or other practitioner authorized by law, employing the science or art of any branch of the profession of pharmacy, incorporating ingredients to

cy."); and http://www.merriam-webster.com/dictionary/ pharmacy (defining "pharmacy" as: "the art, practice, or profession of preparing, preserving, compounding, and dispensing medical drugs" and "a place where medicines are compounded or dispensed.").

Franck's and Campbell suggest that the Court instead use the definitions of "pharmacist" and "pharmacy" contained in the websites www.dictionary.com and www.oxforddictionaries.com (Doc. 40, pp. 7-8). These websites define "pharmacist" as "a person licensed to prepare and dispense drugs and medicines," and "pharmacy" as "a store where medicinal drugs are dispensed and sold." The Court finds that these definitions, by use of the word "prepare," do not exclude "compounding" (i.e, preparing and manufacturing drugs) from the definition of pharma-

cist. And if it is the intent of Franck's and Campbell to rely on these definitions to state that pharmacists <u>only</u> sell and distribute medicines, and do not manufacture or compound medicines and supplements, such definitions are too narrow, unreasonable, and are directly contrary to Florida statutes, regulatory code, and several persuasive case authorities.

12. On October 18, 2012, the Eleventh Circuit Court of Appeals vacated this decision, pursuant to a joint motion of the parties to dismiss the appeal and vacate the district court's ruling. United States v. Franck's Lab, Inc., 2012 WL 10234948 (11th Cir. Oct. 18, 2012). The Court is therefore not citing to United States v. Franck's Lab, Inc. as binding precedent, but finds that several of the discussion points are persuasive and relevant to this case.

create a finished product for dispensing to a patient or for administration by a practitioner or the practitioner's agent; and shall specifically include the professional act of preparing a unique finished product containing any ingredient or device defined by Sections 465.003(7) and (8), F.S. The term also includes the preparation of nuclear pharmaceuticals and diagnostic kits incident to use of such nuclear pharmaceuticals. The term "commercially available products", as used in this section, means any medicinal product as defined by Sections 465.003(7) and (8), F.S., that are legally distributed in the State of Florida by a drug manufacturer or wholesaler.

(1) Compounding includes:

(a) The preparation of drugs or devices in anticipation of prescriptions based on routine, regularly observed prescribing patterns.

(b) The preparation pursuant to a prescription of drugs or devices which are not commercially available.

(c) The preparation of commercially available products from bulk when the prescribing practitioner has prescribed the compounded product on a per-prescription basis and the patient has been made aware that the compounded product will be prepared by the pharmacist. The reconstitution of commercially available products pursuant to the manufacturer's guidelines is permissible without notice to the practitioner.

(2) The preparation of drugs or devices for sale or transfer to pharmacies, practitioners, or entities for purposes of dispensing or distribution is not compounding and is not within the practice of the profession of pharmacy, except that the supply of patient specific compounded prescriptions to another pharmacy under the provisions of Section 465.0265, F.S., and Rule 64B16–28.450, F.A.C., is authorized.

According to the Defendants, Franck's and Campbell's preparation of the nutritional supplements for sale to a veterinarian who dispensed them to the polo horses falls within subsection (2) of this Rule, and therefore is "not compounding" and, in turn, is not the practice of pharmacy. Rather, Franck's and Campbell were acting as drug manufacturers, not pharmacists.

■■■ The Defendants misinterpret this section of the Florida Administrative Code. Subsection (2) of Fla. Admin. Code R. 64B16–27.700 is the drug manufacturing exception to compounding. Drug manufacturing—the production of mass quantities—is governed by the FDA, compounding of individual drugs by prescription generally is not. See Medical Center Pharmacy v. Mukasey, 536 F.3d 383, 387–391 (5th Cir.2008); Pharmacists Mut. Ins. Co. v. Urgent Care Pharmacy, Inc., 413 F.Supp.2d 633 (D.S.C.2006) (both discussing the difference between drug compounding and drug manufacturing). This language in Fla. Admin. Code R. 64B16–27.700 simply makes clear that when an entity mass produces or manufacturers drugs for sale or distribution, it is not compounding. The facts of this controversy as alleged in the Underlying Case clearly do not equate to drug manufacturing—rather, as the third amended complaint alleges, Franck's and Campbell compounded a specific supplement for one time use based on an individual prescription formula transmitted by a licensed veterinarian. They were not engaged in the mass manufacturing of drugs, but were acting as compounding pharmacists.[13] Accordingly, this subsection does not apply.

---

13. The Court further notes that in United States v. Franck's, 816 F.Supp.2d 1209, the district court remarked that the precise conduct at issue in the present case—the prepara-

Lastly, Franck's and Campbell argue that their actions as alleged in the Underlying Case were not those of a "pharmacist" by relying on an order from the trial court in the Underlying Case. The trial court order ruled on a motion for partial summary judgment, and addressed whether Franck's could be held liable under theories of negligence and/or strict liability (Doc. 40, Ex. A). The trial court determined that Franck's acts in compounding the nutritional supplements "distinguish [it] from that of ordinary retail pharmacists/druggists," and held that Franck's could be held liable under a theory of strict liability. (Id., p. 3).

This order from the Underlying Case does not establish either that compounding is not part of the practice of pharmacy, or that the term "pharmacist" as used in Cincinnati's Policies is ambiguous. Indeed, it suggests the contrary and merely states that when a pharmacist creates a drug (as opposed to merely selling something already in existence), the pharmacist may be liable under a theory of strict liability, as well as negligence. It does not mean that the pharmacist ceases to operate as a pharmacist. And in this case, it is clear that Franck's and Campbell were operating here as compounding pharmacies/pharmacists. See Fontanez v. Parenteral Therapy Assocs., Inc., 974 So.2d 1101 (Fla. 5th Dist.Ct.App.2007) (noting that a pharmacist who compounds a drug may be sued under a theory of strict liability, whereas pharmacists who merely sell drugs manufactured by others may only be sued under a negligence theory).

In sum, relevant Florida statutory and regulatory authority, the plain meaning of the term, as well as persuasive case law, all fully support a finding that the term "pharmacist" is not ambiguous, and that it encompasses "compounding." The third amended complaint in the Underlying Case clearly alleges that Franck's and Campbell were engaged in compounding, and therefore their actions as alleged in that pleading fall within the clear and unambiguous "pharmacist" term as set forth in the professional health care services exclusion.

## B. The Term "Professional Health Care Services"

■ The Defendants next contend that the core term of the "professional health care services" exclusion is ambiguous because it is also not defined in Cincinnati's Policies and therefore the exclusion cannot apply. The Defendants make two arguments: (1) that Florida statutes and case law do not define pharmacists as "health care providers;" and (2) that the plain meaning of the term "professional health care services" refers solely to the care of humans, not animals.

The Defendants first argument relies on two Florida decisions: GalenCare, Inc. v. Mosley, 59 So.3d 138 (Fla. 2d Dist.Ct.App. 2011) and Sova Drugs, Inc. v. Barnes, 661 So.2d 393 (Fla. 5th Dist.Ct.App.1995). Both of these decisions concern whether Florida's medical malpractice presuit notice requirements (see Fla. Stat. § 766.106) apply to pharmacies and pharmacists. Both decisions hold that pharmacies and pharmacists are not subject to these presuit notice requirements because they are not listed as a "health care provider" under the medical malpractice statutory scheme. GalenCare, 59 So.3d at 141; Sova, 661 So.2d at 394–95. However, both decisions also recognize that pharmacies and pharmacists are routinely treated as health care providers under Florida law, but that the Florida

tion of the nutritional supplement that was administered to the 21 polo horses, causing their deaths—constituted compounding under

Florida statutes and the Florida Administrative Code.

Legislature simply chose to exclude them from medical malpractice presuit notice requirements. GalenCare, 59 So.3d at 141–42; Sova, 661 So.2d at 395. Simply put, these decisions do not state, or even intimate, that pharmacies or pharmacists do not provide "professional health care services," and do not discuss or mention insurance coverage or a products and professional services exclusion; they are limited solely to the medical malpractice presuit requirement. See State Farm Florida Ins. Co. v. Campbell, 998 So.2d 1151 (Fla. 5th Dist.Ct.App.2008) (differentiating between medical malpractice claims subject to the presuit notice requirements, and claims of insurance contract interpretation where the question is whether an insured who was preparing to take an x-ray performed "professional services"). The Court is therefore not persuaded that either Galen-Care or Sova demonstrate that the term "professional health care services" is ambiguous and/or excludes pharmacies and pharmacists.

■ Next, the Defendants argue that the term "professional health care services" applies only to the provision of services to human beings, not to animals. No decisional authority whatever is cited in support of this proposition. Turning first to the plain meaning of these terms, the Court again relies upon dictionary definitions. Merriam Webster's Dictionary Online defines "healthcare" as "the prevention or treatment of illness by doctors, dentists, psychologists, etc.," and "efforts made to maintain or restore health especially by trained and licensed professionals." There is no mention of "humans" and the definition does not exclude "animals." See http://www.merriam-webster.com/dictionary/healthcare. "Service" is defined

as "the occupation or function of serving" and "the work performed by one that serves;" again there is no differentiation between humans and animals. See http://www.merriam-webster.com/dictionary/service [14] Thus, under the plain meaning of these terms, the Court cannot say that "healthcare" and "services" are ambiguous, or apply solely to human patients. On the contrary, Florida's Veterinary Medical Practice Act lists an animal as a "patient" and a "veterinarian" as a "health care practitioner." See Fla. Stat. § 474.202(8), (11).

The Court is further persuaded by court decisions applying Florida law and addressing similar "professional services" exclusions. For example, in State Farm Florida Ins. Co. v. Campbell, 998 So.2d 1151 (Fla. 5th Dist.Ct.App.2008), an employee of the insured was positioning a patient's foot to take an x-ray, and the patient lost her balance, fell, and suffered injury. The insured, who was covered under a business liability policy, filed a claim, which the insurer denied, citing to a "professional services exclusion" that excluded coverage for damage "due to the rendering or failure to render any professional services or treatments." 998 So.2d at 1153. The district court of appeals held that "[w]hether an act arises from the providing of a professional service is 'determined by focusing upon the particular act itself,' not the character of the individual performing the act." 998 So.2d at 1154 (quoting Lindheimer v. St. Paul Fire & Marine Ins. Co., 643 So.2d 636, 638 (Fla. 3d Dist.Ct.App.1994)). "That the act or service occurred in a professional's office is not determinative, the act or service must be causally connected to the professional service being provided." Id.

---

14. The Defendants cite to the definitions contained in www.dictionary.com, which define "healthcare" as "the field concerned with the maintenance or restoration of the health of the body or mind" and "service" as "an act of helpful activity; help; aid." Again, neither definition distinguishes between human vs. animal patients.

See also Estate of Tinervin v. Nationwide Mut. Ins. Co., 23 So.3d 1232 (Fla. 4th Dist.Ct.App.2009) (holding that wife of doctor who misfiled patient tests was performing a "professional service" such that an insurance policy exclusion of claims arising out of the providing or failure to provide professional services applied).

Similarly in Maryland Cas. Co. v. Smartcop, Inc., a Southern District of Florida decision addressing a "professional services exclusion," the court noted that "[r]egardless of whether a complaint uses different words than 'the specific words in the policy or relevant definitions does not change the analysis—using synonyms and broad terms will not circumvent the plain meaning of the [policy's] language.'" 2012 WL 4344571, at *4 (S.D.Fla. Sept. 21, 2012) (quoting General Fidelity Ins. Co. v. Foster, 808 F.Supp.2d 1315, 1320 (S.D.Fla. 2011). See also Trailer Bridge, Inc. v. Illinois Nat. Ins. Co., 657 F.3d 1135, 1145 (11th Cir.2011) ("[T]he theories advanced and labels used in a complaint are subordinate to the facts alleged for the purpose of determining the duty to defend.") (quoting Harris Corp. v. Travelers Indem. Co., 1998 WL 1657171, at *2 (M.D.Fla. Mar.19, 1998)). See also Alpha Therapeutic Corp. v. St. Paul Fire and Marine Ins. Co., 890 F.2d 368 (11th Cir.1989) (noting that the term "professional service" in an insurance policy exclusion was unambiguous, and holding that a medical technician who transposed figures on a blood hepatitis study was engaging in "professional services" such that the exclusion applied; the analysis focuses on the nature of the acts performed, rather than the person performing them).

■ These decisions make clear that when analyzing whether a service is a "professional health care service" courts must look at the nature of the service itself, and who is performing it, not the end user/patient. In other words, the focus must be on whether the injuries ultimately resulted from a professional health care type service being performed. In the present case, Franck's and Campbell, as alleged in the Underlying Case, were acting as pharmacists, and were performing the service of compounding a nutritional supplement. Such actions are clearly "health services"—i.e., an "effort to maintain or restore health especially by trained and licensed professionals." The fact that the end user of the supplement was a horse as opposed to a human is of no moment. Cf. Mukasey, 536 F.3d at 387–88 ("Drug compounding is the process by which a pharmacist combines or alters drug ingredients according to a doctor's prescription to create a medication to meet the unique needs of an individual human or animal patient.") (emphasis added).[15]

■ Moreover, the exclusion at issue, when read in toto states that it does not cover any injury or damages "arising out of" the rendering or failure to render professional health care services as a pharmacist. The Florida Supreme Court has interpreted the phrase "arising out of" when used in an insurance policy exclusion to be "broader in meaning than the term 'caused by' and means 'originating from,' 'having its origin in,' 'growing out of,' 'flowing from,' 'incident to,' or 'having a connection with.'" It requires "some causal connection, or relationship" between the conduct and the injury, but does not require proximate causation. Taurus Holdings, 913 So.2d at 539–540. See also Maryland Cas. Co. v. Smartcop, Inc., 2012 WL 4344571, at

---

**15.** Franck's and Campbell's reliance upon Cincinnati Ins. Co. v. Colony Ins. Co., 2009 WL 5209026 (W.D.Mo. Nov. 16, 2009) is unavailing. This decision does not define or suggest that the term "professional health care services" is limited solely to the treatment of human beings.

* 3 (S.D.Fla. Sept. 21, 2012) ("The Florida Supreme Court has consistently interpreted the phrase 'arising out of' broadly to encompass all of the following meanings: 'originating from, having its origin in, growing out of, flowing from, incident to, or having a connection with.'"). The allegations of wrongdoing in the Underlying Case—that Franck's and Campbell improperly compounded a nutritional supplement for administration to polo horses—clearly "arise out of" Franck's and Campbell's "rendering or failure to render professional health care services as a pharmacist."

The Court thus concludes that the term "professional health care services" is not ambiguous, and that it covers the actions performed by Franck's and Campbell as alleged in the third amended complaint of the Underlying Case. And as previously discussed, the actions allegedly undertaken by Franck's and Campbell also fall within the plain meaning of the term "pharmacist." As such, the professional health care services exclusion applies.

### III. The Products Completed Operations Hazard Exclusion

 Both of the Policies also contain an exclusion stating that insurance coverage does not apply to "Bodily injury" or "property damage" included within the "products completed operations hazard." (Doc. 55, Exs. 4, 5). As discussed above, the "products completed operations hazard" includes all "bodily injury" and "property damage" occurring away from premises owned or rented by the insured, and arising out of the insured's "product" or "work." The exclusion does not apply to: (1) products still in the insured's physical possession; or (2) work that has not yet been completed or abandoned by the insured. (Doc. 1-4, pp. 43-45, 83-85). In other words, the Policies exclude all property damage and/or bodily injury that occurs away from the insured's premises, where

such damage arises out of the insured's completed product or completed work.

The Florida Supreme Court has held that this exclusion is unambiguous, and applies to any claim that arises out of the insured's completed product when damages occur away from the insured's premises. Taurus Holdings, 913 So.2d at 537–38. The exclusion applies regardless of the legal theory asserted (i.e. negligence or strict liability) and regardless of whether the product is defective. Id. See also K–C Mfg. Co. v. Shelby Mut. Ins. Co., 434 So.2d 1004, 1006 (Fla. 1st Dist.Ct.App.1983). Cf. Florida Farm Bureau v. James, 608 So.2d 931 (Fla. 4th Dist.Ct.App.1992) (the products completed operations hazard exclusion applies to a claim involving delivery of a defective product, but does not apply to a claim alleging negligent delivery of the wrong product, because delivery of the wrong product does not complete the work); Aerothrust Corp. v. Granada Ins. Co., 904 So.2d 470 (Fla. 3rd Dist.Ct.App. 2005) (products completed operations hazard exclusion applied to exclude coverage for damages resulting from the negligent inspection of a hoist, where the inspection had been completed five months earlier).

Applying this exclusion to the facts as alleged in the Underlying Case, it is clear that the exclusion applies. It is alleged that Franck's and Campbell compounded, formulated, and/or manufactured a defective nutritional supplement; that the supplement, once fully compounded and packaged, was delivered to a veterinarian for use on the 21 polo horses; and that the damages (the death of the horses) occurred after Franck's and Campbell had completed their work on the supplement. (Doc. 1-1, Ex. B). These facts clearly show that Franck's and Campbell completed production of their "product" and completed their "work" prior to the occurrence of any damages, and that the damages that

arose from the use of this "product" and "work" occurred away from Franck's and Campbell's premises. See Fontanez, 974 So.2d at 1105 (noting that "when a pharmacist compounds a drug, he is actively involved in the preparation of the end product," and the pharmacist may therefore be held liable under a theory of strict liability).[16]

Defendants Franck's and Campbell do not challenge any of this analysis, do not contend that the terms of the products completed operations hazard exclusion itself are ambiguous, and do not object to the conclusion that the facts as alleged in the Underlying Case would fall within the exclusion. To the contrary, they agree that the Underlying Action seeks damages stemming from Franck's and Campbell's completed products and/or operations. (Doc. 59, p. 23). Rather, they argue that the exclusion cannot apply in this case due to inconsistencies in the Policies—specifically inconsistencies with respect to whether or not this exclusion even exists.

### A. Purported Discrepancies in the Policies

According to Franck's and Campbell, both of Cincinnati's Policies in fact provided products completed operations hazard coverage, and therefore, the purported exclusion of such coverage renders the exclusion null and void, or at least ambiguous, and unenforceable. In support of this argument, these Defendants point to the Declarations page of the Commercial General Liability Policy, which lists an aggregate limit of $2,000,000 for "Products-Completed Operations." (Doc. 1-4, p. 24). The same page also lists a "Total Annual Premium" of $8,807, a rate of .296 for "Products/Completed Operations," an "Advance Premium" for "Products/Completed Operations"

of $1,308, and an "Advance Premium" of $7,284.00 for all other coverage (Id.). In addition, under the section entitled "Limits of Insurance," the Policy states that "The Products Completed Operations Aggregate Limit is the most we will pay under COVERAGE A. BODILY INJURY AND PROPERTY DAMAGE LIABILITY for damages because of 'bodily injury' and 'property damage' included in the 'products completed operations hazard.'" (Doc. 1-4, p. 37). The Umbrella Policy lists the same $2,000,000 "Products-Completed Operations Aggregate Limit" (Doc. 1-4, pp. 64, 76).

These provisions are included in the same Policies that also include the "products completed operations hazard" exclusion. Thus, it appears in one part of the Policies that "products completed operations hazard" coverage exists, while in another section, such coverage is excluded. This creates an inherent inconsistency and ambiguity in the Policies. See Hammerstone v. Indiana Ins. Co., 986 N.E.2d 841 (Ind.Ct.App.2013) (finding that umbrella insurance policy was inherently ambiguous and had to be strictly construed against insurer to provide coverage where policy both contained a products completed operations hazard exclusion and listed a $2 million aggregate coverage limit for products competed operations hazards).

Franck's and Campbell point to one other discrepancy in the Commercial General Liability Policy which they contend establishes that the products completed operations hazard exclusion is ambiguous. The Declarations Page lists, under the heading "Classification" that "drugstores" are afforded products completed operations coverage in the same aggregate amounts listed above (Doc. 1-4, p. 24). The Policy does

---

16. The Court also notes that the trial court in the Underlying Case also found that Franck's compounding of the nutritional supplement

subjected Franck's to a strict liability cause of action.

not define "classification" or "drugstores." Moreover, in another section of the Policy, the term "products completed operations hazard" is defined to exclude property damage arising out of "products or operations for which the classification, listed in the Declarations or in a schedule, states that products completed operations are included." (Doc. 1-4, p. 44). Thus, in addition to containing words that are not defined, it appears that the Policy affords coverage for "drugstores" in one section, yet excludes coverage in another.

## B. Which are the Real Policies?

Cincinnati responds to Franck's and Campbell's arguments by stating that the Policies these Defendants rely upon are not the final versions of the Policies at issue in this case, and were not the final versions of the Policies in effect at the time of the deaths of the polo horses. According to Cincinnati, the Policies took effect on January 1, 2007. The Policies transmitted to Franck's on that date did, in fact, contain the Declarations Page which listed coverage for the products completed operations hazard. Shortly after the Policies were issued to Franck's, Cincinnati's underwriter, Michelle Shaffer, identified a clerical error in the Policies regarding the products completed operations hazard coverage—such coverage was not intended to be included in the Policies. See Affidavit of Michelle Shaffer (Doc. 61-4). On February 28, 2007, over two years prior to the events involved in the Underlying Case, Ms. Shaffer emailed a notice of correction to Stephen Lossing of the Lossing Insurance Agency, the agent of record for Franck's. (Id., pp. 4-5). Corrected Declarations Pages removing the products completed operations hazard coverage both from Franck's and from the "drug-

stores" classification were issued to Franck's (via their agent of record), the annual premium for each year of the three-year Policy period (January 2007 through January 2010) was reduced from $8,807 to $7,743, and Franck's was refunded $211 to account for the removed coverage. (Id., pp. 6, 74, 81; Doc. 61-6, p. 38).[17]

In support of this position, Cincinnati has also submitted the affidavit of Stephen Lossing (Doc. 70-2). Since January 1, 2004, Mr. Lossing has been the agent of record for Franck's. He participated in and was involved in the submission of applications for insurance coverage for Franck's, as well as the servicing of those accounts. In particular, he represented Franck's in its dealings with Cincinnati to obtain the Policies at issue in this case. (Id.). Mr. Lossing avers that when he was in the process of applying for liability insurance coverage for Franck's, he understood that the Policies Cincinnati issued to Franck's did not afford products completed operations hazard coverage, and that such an exclusion has been a part of the commercial general liability and umbrella policies Cincinnati issued to Franck's since 2004. (Id., ¶ 8). Mr. Lossing further averred that he met at least annually with Franck's operations manager or other representative to review liability coverage under these Policies. Finally, Mr. Lossing confirmed receipt of the February 28, 2007 emails from Michelle Shaffer concerning the error in the Policies, and confirmed that products completed operations hazard coverage was excluded from the Policies. (Id., ¶ 11). According to Mr. Lossing, it was always his understanding that products completed operations hazard coverage was not part of Cincinnati's Policies issued to Franck's, but was instead covered by a separate profes-

17. Franck's and Campbell moved to strike these versions of the Policies on the grounds that they were not authenticated and were not properly disclosed under Fed. R. Civ. P. 26 (Doc. 62). The Magistrate Judge denied the motion (Doc. 79).

sional liability policy issued to Franck's by a different insurer. (Id., ¶ 12).[18]

·Based on this evidence, there can be no genuine issue of fact that the initial inclusion of the Declarations Page showing products completed operations hazard coverage was in error, that this error was a mutual mistake, that both Cincinnati and Franck's (through its insurance agent of record) agreed to correct this mutual mistake, and that the Policies were the subject of a novation in February 2007, consummated by the acceptance of the refunded and reduced premium. See, e.g., Security Ins. Co. of Hartford v. Baad, 657 So.2d 10 (Fla. 3rd Dist.Ct.App.1995) ("The acceptance of an alteration or modification of the original contract, to be effective, must precede the loss.") (quoting George J. Couch, Cyclopedia of Insurance Law, § 65:13 (2 ed. 1983)); E.J. Evans Co. v. The Ohio State Life Ins. Co., 144 So.2d 833, 835 (Fla. 2d Dist.Ct.App.1962) ("In the absence of controlling statutory or contract provisions agents with actual or ostensible power to enter into contract of insurance have authority to modify, by and with the consent of the insured, policies already issued.").

▮▮▮▮ Alternatively, if the Court's grant of summary judgment to Cincinnati both on the "professional health care services" exclusion, as well as on the issue of novation were vacated on appeal, the Court would permit Cincinnati the opportunity to file an amended pleading to assert a claim for reformation, which would then, on this record, be granted. In Florida, "[a] court of equity has the power to reform a written instrument where, due to a mutual mistake, the instrument as drawn does not accurately express the true intention or agreement of the parties." Provi-

dence Square Ass'n, Inc. v. Biancardi, 507 So.2d 1366, 1369 (Fla.1987). Given the "strong presumption" that a contract accurately expresses the true intention or agreement of the parties, however, the party seeking reformation on the basis of a mutual mistake faces a high evidentiary burden. Ins. Co. of N. Am. v. Ours, 266 So.2d 168, 169 (Fla. 4th Dist.Ct.App.1972). That party must show by clear and convincing evidence "that the parties [to the contract] agreed on one thing and when they put it in the contract they said something different." Blumberg v. Am. Fire & Cas. Co., 51 So.2d 182, 184 (Fla.1951); see Rosenthal v. First Nat'l Fire Ins. Co., 74 Fla. 371, 77 So. 92, 94 (1917); see also Golden Door Jewelry Creations, Inc. v. Lloyds Underwriters Non–Marine Ass'n, 8 F.3d 760, 765–67 (11th Cir.1993). "Clear and convincing evidence" is evidence that "produces in the mind of the trier of fact a firm belief or conviction, without hesitancy, as to the truth of the allegations sought to be established." S. Fla. Water Mgmt. Dist. v. RLI Live Oak, LLC, 139 So.3d 869, 872 (Fla.2014).

Florida courts have found mutual mistake where the party seeking reformation presented evidence of "contact between the [contracting] parties," such as discussion or negotiation of a particular provision, showing that they agreed on one thing before they put their agreement in writing and that their written agreement said something different. USAA Cas. Ins. Co. v. Threadgill, 729 So.2d 476, 478–79 (Fla. 4th Dist.Ct.App.1999) (discussing cases); see, e.g., Fed. Ins. Co. v. Donovan Indus., Inc., 75 So.3d 812, 813–15 (Fla. 2d Dist.Ct.App.2011).

**18.** Cincinnati has also submitted a series of emails between Mr. Lossing and several officers of Franck's, in which Mr. Lossing explains that the Policies issued by Cincinnati have always contained a products completed operations hazard exclusion and therefore would not cover Franck's or Campbell in the Underlying Case (Doc. 70-11).

The Court finds that Cincinnati has satisfied its burden under the law of Florida to show that a mutual mistake occurred, and that it would be entitled to reformation of the Policies. The Defendants have submitted the renewal application signed by Mr. Lossing, which clearly states that an exclusion entitled "Products & Professional Services" was to be included in the Policies (Doc. 63-1, p. 17). Cincinnati has also submitted Mr. Lossing's affidavit, in which he avers that products completed operations hazard coverage was never to be included in Cincinnati's policies, as well as various emails between Mr. Lossing and representatives of Franck's, in which Mr. Lossing states that products completed operations hazard coverage does not exist in the Cincinnati Policies. Moreover, Cincinnati has attached the affidavit from its employee, Ms. Shaffer, as well as copies of the Corrected Declarations Pages and proof that the insurance premiums were reduced to account for the absence of products completed operations hazard coverage. All of this evidence establishes as a matter of law, beyond any genuine dispute, that a mutual mistake occurred at the time that the Cincinnati Policies were renewed in January 2007 and that reformation would be available.

Franck's and Campbell seek to avoid summary judgment by arguing that the February 28, 2007 modification of the Policies was invalid. They first reference the renewal application, and claim that it establishes that Franck's actually requested products completed operations hazard coverage. However, as previously discussed, this application clearly states "Exclusion—Products & Professional Services" (the same title of the endorsement in the Policies that lists the relevant exclusions).

Franck's and Campbell next cite to the affidavit of Paul W. Franck, the President, Secretary, Treasurer, and Director of Franck's, who avers that Franck's always understood the Policies to provide products completed operations hazard coverage, and that Cincinnati never communicated with or negotiated with Franck's regarding excluding such coverage. (Doc. 63-1, pp. 35-36). If "Franck's" as used by Mr. Franck in his affidavit is meant to refer to himself, personally, it is immaterial; if it is meant to refer to the corporation, it is belied by the record. Nevertheless, according to Franck's and Campbell, the affidavit shows that Mr. Lossing did not have Franck's consent to modify the Policies. However, this is not what Mr. Franck's affidavit states. Rather, Mr. Franck nowhere even mentions Mr. Lossing, or the extent of his authority.

■ It is also worth noting that neither Franck's nor Campbell ever challenge the fact that Mr. Lossing was their agent; that Mr. Lossing was authorized to apply for commercial general liability insurance from Cincinnati; that he in fact applied for and obtained such insurance; and that Mr. Lossing agreed to the February 28, 2007 policy correction. Moreover, Mr. Franck also does not dispute that Cincinnati reduced the annual premium for its insurance after the February 28, 2007 policy correction, nor does he dispute that Franck's received the benefit of this premium reduction for several years, including 2009.[19] It is the law of Florida that an insured is bound by the actions of its broker. Auto-Owners Ins. Co. v. Yates, 368 So.2d 634 (Fla. 2d Dist.Ct.App.1979). And Mr. Franck has not presented any evidence contesting that Mr. Lossing was his

---

19. The Court notes that the emails exchanged between representatives of Franck's and Mr. Lossing establish that Franck's considered Mr. Lossing to be their agent of record for insurance purposes, and relied on him to obtain and maintain their various insurance policies.

agent and had the authority to obtain and modify insurance policies.[20]

The Court thus finds that the Policies as corrected on February 28, 2007 are the official and valid policies of insurance that covered Franck's and Campbell at the time of the loss of the polo horses. These policies clearly contained an unambiguous exclusion for products completed operations hazard coverage, as well as an exclusion of such coverage for the classification of "drugstores," and there is no dispute that such an exclusion squarely forecloses coverage in this case based on the facts as alleged in the Underlying Case's third amended complaint. Accordingly, Cincinnati has no duty to defend Franck's or Campbell.[21]

### C. Florida Statute § 627.4133

■ Franck's and Campbell lastly seek to avoid application of the novation doctrine by arguing that Cincinnati failed to comply with Florida's non-renewal statute, Fla. Stat. § 627.4133. That statute, entitled "Notice of cancellation, nonrenewal, or renewal premium," provides in relevant part:

(1) (a) An insurer issuing a policy providing coverage for workers' compensation and employer's liability insurance, property, casualty, except mortgage guaranty, surety, or marine insurance, other than motor vehicle insurance subject to s. 627.728, shall give the first-named insured at least 45 days' advance written notice of nonrenewal or of the renewal premium. If the policy is not to be renewed, the written notice shall state the reason or reasons as to why the policy is not to be renewed. This requirement applies only if the insured has furnished all of the necessary information so as to enable the insurer to develop the renewal premium prior to the expiration date of the policy to be renewed.

Fla. Stat. § 627.4133.

While this provision by its terms only appears to apply to the nonrenewal of insurance policies, Franck's and Campbell have cited to one Florida decision, United States Fire Ins. Co. v. Southern Sec. Life Ins. Co., 710 So.2d 130 (Fla. 5th Dist.Ct. App.1998), which applied Fla. Stat. § 627.4133 to an insurance carrier's renewal of a policy that deleted or removed coverage previously afforded.

Franck's and Campbell's argument is creative, but without merit. First this is not a situation where Cincinnati issued a renewed policy that removed coverage previously afforded. Cincinnati has produced affidavits from both its own employee and Franck's insurance agent, in which they both averred that Cincinnati has always excluded products completed operations hazard coverage, and that the exclusion

---

**20.** Franck's and Campbell also seek to exclude Mr. Lossing's affidavit, and the emails exchanged between him and Franck's representatives on the grounds that they are extrinsic evidence being used to interpret ambiguous terms in the Policies. These documents are not being used for any such purpose. Rather, they have been submitted, and the Court has considered them, for the narrow purpose of determining whether the Policies were properly modified due to a mutual mistake between Cincinnati and Franck's. If the Policies were properly modified, there is no ambiguity that requires interpretation. If they were not, then an ambiguity clearly exists, which would be construed against Cincinnati.

**21.** The Court rejects Franck's and Campbell's invitation to follow Little v. American States Ins. Co., 179 S.W.3d 433 (Mo.Ct.App.2005). The Policies at issue in this case, as corrected on February 28, 2007, clearly and unambiguously exclude coverage for bodily injury and property damage that falls within the definition of products completed operations hazard, excludes such coverage for the classification of "drugstores," and clearly and unambiguously defines the term "products completed operations hazard."

was intended to be part of the 2007-2010 Policies. Thus, this is a policy modification due to a mutual mistake, not a failure to give advance notice of a policy change.

Secondly, even if the statute did apply, it would not provide Franck's and Campbell any relief. The provision requires at least 45 days advance notice of any policy changes, and if the insurer fails to provide such notice, "the coverage provided to the named insured shall remain in effect until 45 days after notice is given or until the effective date of replacement coverage obtained by the named insured whichever occurs first." Fla. Stat. § 627.4133(1)(c). In this case, it is undisputed that Cincinnati did give notice to Franck's on February 28, 2007 when it sent the email and Corrected Declarations Pages to Mr. Lossing (and neither Defendant has made any argument that notice to Mr. Lossing was legally ineffective). Forty-five days from that date would be on or about March 14, 2007. At that time (approximately two years before the loss of the polo horses), the products completed operations hazard exclusion would have gone into effect, and would have been valid and enforceable at the time of the horses' death.

In sum, based on the relevant policy language, the allegations of the Underlying Case, the facts as to which no genuine dispute exists, and binding and persuasive statutory and case law, the Court finds as a matter of law that the exclusions set forth in Cincinnati's Policies are clear and unambiguous and preclude coverage of both Franck's and Campbell. Cincinnati has no duty to defend, and because the duty to defend is broader than the duty to indemnify, Cincinnati also has no duty to indemnify Franck's or Campbell. In turn, there was no breach of the insurance policies, and the counterclaim for breach of contract cannot go forward. All issues in this case have now been resolved.

## Conclusion

Accordingly, upon due consideration, it is hereby ORDERED as follows:

(1) Plaintiff Cincinnati Insurance Company's Motions for Summary Judgment (Docs. 34, 55) are GRANTED, and the Court hereby DECLARES that Cincinnati Insurance Company has no duty to defend Franck's Lab, Inc., or Anthony J. Campbell in the action styled Quorum Management Corp., etc., et al. v. Franck's Pharmacy, Inc., et al., Case No. 50 2010 CA 009112 XXXX MB, filed in the Fifteenth Judicial Circuit, In and For Palm Beach County, Florida;

(2) Defendants Quorum Management Company, Juan Martin Nero, Guillermo Caset, Nicholas Espain, and Diamond State Insurance Company's Cross Motion for Summary Judgment (Doc. 39) is DENIED;

(3) Defendants Franck's Lab, Inc.'s and Anthony J. Campbell's Motion for Summary Judgment (Doc. 59) is DENIED; and

(4) The Clerk is directed to enter final judgment in favor of Plaintiff Cincinnati Insurance Company and against all Defendants in accordance with the dictates of this Order. The Clerk is further directed to terminate all other pending motions and to close the file.

IT IS SO ORDERED.

DONE and ORDERED at Ocala, Florida this 13th day of May, 2016.